IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREENBRIER LEASING COMPANY LLC, an Oregon limited liability company f/k/a GREENBRIER LEASING CORPORATION, a Delaware corporation, and THE GREENBRIER COMPANIES, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES B. CARROLL, an individual d/b/a JBC & ASSOCIATES, and JBC & ASSOCIATES, an Illinois business entity,<br><br>Defendants. | Case No. 07 C 2884 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Greenbrier Leasing Company LLC and its parent, the Greenbrier Companies Inc., have sued James B. Carroll, along with an apparently unregistered business entity in whose name Carroll has sometimes done business, for what they allege is Carroll's wrongful failure to pay in full for railcars Greenbrier Leasing sent to an Indiana scrapyard on Carroll's account in 2004. Greenbrier Leasing Company LLC, which the Court calls "Greenbrier" except when otherwise noted, has moved for summary judgment on the issues of liability and damages. For the reasons set forth below, the Court grants summary judgment in favor of Carroll on Greenbrier's breach of contract claim (Count 1) but grants summary judgment in favor of Greenbrier with regard to liability on its claim of unjust enrichment (Count 2). The Court declines to

grant summary judgment in Greenbrier's favor on the issue of damages.

**Background**

This is a diversity suit. Greenbrier Leasing Company LLC is a limited liability company whose sole member is the Greenbrier Companies, Inc., an Oregon corporation that has its principal place of business in that state. Thus, Greenbrier Leasing Company, LLC is a citizen of Oregon. *See Mutual Assignment & Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858, 861 (7th Cir. 2004); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). Carroll is a citizen of Illinois.

Greenbrier's business is leasing and selling railcars. It sometimes sells railcars as scrap—that is, to buyers interested not in using them as railcars but rather in dismantling them and using or selling the steel and other basic materials from which the cars are built. Carroll's business involves selling railcar components and buying and selling railcars for scrap.

The events that gave rise to this lawsuit began with a phone call that Carroll placed to Robert Rea, an employee of a Greenbrier affiliate who was then Greenbrier's agent for scrap sales, in early 2004. Another Greenbrier employee, named Kendig, had referred Carroll to Rea. Carroll, who had never before done business with Greenbrier, asked Rea whether Greenbrier had any railcars for sale as scrap in the Midwest. A short discussion ensued. At a minimum, this discussion covered certain details of how Carroll and Greenbrier might do business, including that Greenbrier would send railcars on Carroll's account to a scrapping facility operated by Brandenburg Industrial Service Co. in Gary, Indiana. Beyond this, the record contains conflicting testimony over

2

whether the discussion also involved a price term. Rea testified at his deposition that Carroll said he would pay Greenbrier $210 per gross ton. Carroll testified that the two men "talked about current pricing at the time [but] never came up with a number." Def. Statement of Facts, Ex. 10 at 14. The parties agree that the conversation ended with Rea telling Carroll to send him a written proposal.

On April 5, 2004, Carroll sent Rea a letter in which he proposed to purchase railcars for scrap from Greenbrier in accordance with a set of ten conditions spelled out in the letter. Among these are a requirement that a purchase order number issued by Carroll appear on any invoice submitted by Greenbrier for Greenbrier to receive payment on that invoice and a provision that "[p]rices will be based on the Iron Age first issue Chicago Market. 5 foot P&S high side less $45.00 F.O.B. EJ&E Gary Works." Pl. Statement of Facts, Ex. F at 2. *Iron Age* is a periodic price bulletin that publishes prevailing scrap prices in various markets, including Chicago's.

Carroll did not speak with Rea or anyone else at Greenbrier after he sent his April 5 letter. It is not clear why, but Rea testified in his deposition that Carroll did not return multiple phone messages. According to Rea, the purpose of these calls was to discuss the relationship of the price formula in Carroll's April 5 letter to the $210 price Rea recalls discussing with Carroll.

Between May 4 and June 9, Greenbrier sent forty railcars to Brandenburg on Carroll's account. The parties disagree about whether Carroll knew in advance of this delivery. Carroll maintains it came as a surprise to him, while Greenbrier offers the testimony of a Brandenburg employee, Rita Fields, to the effect that Carroll called Brandenburg before the railcars had arrived with the instruction that Brandenburg

3

should expect the delivery on his account. One way or the other, Brandenburg offered and Carroll accepted a price of $150 per gross ton for the rail cars, minus their more valuable wheel sets. It is undisputed that Brandenburg paid Carroll a total of $180,397.85 for the railcars.

At Carroll's request, Brandenburg removed the wheel sets from all but one of the forty railcars. The one wheel set that was not removed was scrapped along with the railcar to which it was attached. Carroll sold thirty-eight of these wheel sets to another entity, Progress Rail Services. As the Court discusses below, the parties dispute how much Carroll received from Progress Rail for wheels from Greenbrier railcars.

Carroll paid Greenbrier $60,000 for the railcars in three separate transfers during 2004 and early 2005. He has made no further payments to date. In November 2005, Greenbrier filed suit against Carroll in federal court in Oregon seeking full payment. In June 2006, the Oregon district court determined that it lacked personal jurisdiction over Carroll and dismissed Greenbrier's suit. Greenbrier filed suit in this district in May 2007. It has now moved for summary judgment on the issues of liability and damages on its alternative claims of breach of contract (Count 1) and unjust enrichment (Count 2).

## Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For purposes of the motion, the Court reads the evidentiary record in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby,*

4

*Inc.*, 477 U.S. 242, 255 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

**I.      Liability**

Greenbrier asserts that "Carroll must be ordered to compensate Greenbrier for the 40 rail cars . . . because the material facts regarding liability are undisputed," Pl. Mem. at 1-2, and that "[t]he only true issue to be decided here is the amount due to Greenbrier." Pl. Reply at 6. This is not, however, a concession that the amount of recovery is a disputed issue. Rather, Greenbrier contends that the Court need only choose between awarding contractual damages and restitution for Carroll's unjust enrichment, and it offers calculations for each.

The Court declines to adopt Greenbrier's approach, which emphasizes recovery over the logically antecedent question of the basis for liability. Instead, the Court turns first to the two alternative theories of liability presented in this case to assess whether genuine issues of material fact exist with regard to one or both. Because recovery under an unjust enrichment theory is an equitable remedy available only if a party has no adequate remedy at law, *see Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) (citing *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604, 836 N.E.2d 681, 704 (2005)), the Court will first consider whether Greenbrier has established a claim for breach of its putative contract with Carroll.

**A.      Breach of contract claim**

As Greenbrier correctly points out, under Illinois law,[1] the existence of contract is

---

[1] "When (as here) the parties do not say that the forum state's conflict-of-laws rules require the application of another state's substantive law, this means we must apply the forum state's

(continued...)

5

a matter of law that the Court may appropriately determine on summary judgment. *Ass'n Ben. Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (citing *Arneson v. Bd. of Trs., McKendree Coll.*, 210 Ill. App. 3d 844, 850, 569 N.E.2d 252, 256 (App. Ct. 1991)).

Greenbrier contends that a contract formed when it accepted the offer conveyed in Carroll's April 5, 2004 letter by sending the railcars to Brandenburg on Carroll's account. That letter provided "essential terms," including where the cars were to be delivered and a method for calculating price, and so was an offer, Greenbrier argues. Pl. Mem. at 10. It further argues that Carroll's and its own subsequent conduct—shipping the cars to Brandenburg's Indiana facility and selling them for scrap there, respectively—supports the existence of a contract.

Carroll points to several disputed issues that he says preclude summary judgment on contract liability. He claims ambiguity exists with regard to who his counterparty was—the Greenbrier Companies or Greenbrier Leasing LLC, neither of which employed Rea directly. He also points to a dispute about key terms, including price: Greenbrier now says that the bargain was for $197.50 per gross ton, but it invoiced Carroll at $210 per ton and sought damages based on that same price in the Oregon litigation. Nor was there any agreement about timing or the number of cars to be shipped because, Carroll argues, "[t]hese matters were going to be decided if, and when, Rea called defendant back" following what Carroll insists was a preliminary

---

(...continued)
  substantive law." *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1344-45 (7th Cir. 1988) (quoting *In re Iowa R.R.*, 840 F.2d 535, 543 (7th Cir. 1988)). Far from arguing that some other state's law of contract formation governs, both parties assume that Illinois law applies. Accordingly, the Court will apply the forum state's law.

6

discussion. Def. Mem. at 8. Carroll says he anticipated sending Greenbrier a written purchase order with detailed price and quantity terms, as contemplated by the April 5 letter, but never did so because he did not speak with Rea again. Instead, the railcars simply appeared at Brandenburg on Carroll's account, leaving him with the "hobson's [sic] choice" of selling them to Brandenburg at $150. Def. Mem. at 2.

Greenbrier's argument that no genuine issue of material fact exists as to Carroll's liability on a contract between them fails because of the parties' dispute over the fundamental question whether the April 5 letter was an offer that Greenbrier could accept. Indeed, Greenbrier's position is so weak that the Court determines on its own motion that summary judgment *against* Greenbrier is warranted on this issue, even without a cross-motion by Carroll. *See Goldstein v. Fidelity and Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750-51 (7th Cir. 1996) (entry of summary judgment against movant on district court's own motion was appropriate because the movant himself had sought summary judgment; "the district court thought [movant] was right about the [asserted undisputed] facts but wrong on his assertion that he was entitled to judgment as a matter of law"); *see also, Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, __ F.3d __, Nos. 07-1660 & 07-2116, 2008 WL 2246431, at *8 (7th Cir. June 3, 2008).

The record overwhelmingly refutes Greenbrier's contention that the April 5 letter was an offer that contained the requisite quantum of essential terms. "No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; *nor is a contract formed by an offer that itself lacks*

7

*definite and certain material terms and does not require such terms to be supplied by an acceptance.*" *Ass'n Ben. Servs.*, 493 F.3d at 850 (citing *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300-01, 834 N.E.2d 56, 66 (2005) and Restatement (Second) of Contracts § 33(1)) (emphasis added). "The definite and certain terms requirement . . . ensure[s] that parties in fact have reached an agreement and . . . provide[s] courts with a basis for enforcing the obligations that the parties sought to impose upon one another." *Id.* (citing Restatement (Second) of Contracts § 33 & cmt. (a)-(b)). Under Illinois law, "[e]ven apparently detailed and formal agreements may fail for lack of certainty where they do not manifest mutual assent to essential obligations of the parties." *Id.* (citing *Acad. Chi. Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 983 (1991)).

The April 5 letter fails the definite-and-certain-terms test in at least two important ways. First, with regard to price, the April 5 letter merely says "prices will be based on the Iron Age first issue Chicago market. 5 foot p&s high side less $45.00 F.O.B. EJ&E Gary Works." Pl. Statement of Facts, Ex. F at 2. The letter does not specify how or, more importantly, when prices will be set with reference to *Iron Age*. *Iron Age* is a periodic price bulletin, just as the *Wall Street Journal*'s stock pages are. Scrap prices, like stock prices, fluctuate over time. Thus, at a minimum, some timeframe is necessary for the pricing mechanism sketched out in the April 5 letter to work. The letter itself does not provide one. Had the letter provided, for example, that Carroll would pay the price stated in the last *Iron Age* issue published before a given delivery, Greenbrier would have a stronger argument for a sufficiently clear price term to avoid

8

summary judgment. As written, however, the April 5 letter's ambiguity about when and how the price would be determined with reference to *Iron Age* means it could not have been an offer capable of acceptance.

Greenbrier tries to elide this problem by adopting the lowest price quoted in *Iron Age* from May to July 2004, the date range over which it delivered the railcars to Brandenburg, as the contract price. This, it says, "gives the benefit of all doubt to Carroll." Pl. Reply at 9. This magnanimity, however, does not avoid the problem that there was no offer capable of acceptance.

Second, the letter sets out a framework for future negotiated transactions. The letter's contemplation of future purchase orders and its reference to the *Iron Age* periodical as price benchmark support Carroll's claim that he called Rea to learn "whether The Greenbrier Companies would, generally, be willing to sell him railcars" and that his "game plan" was to negotiate individual sales—with prices and quantities to be hammered out for each discrete transaction—under the framework set out in the letter. Def. Mem. at 1-2.

For these reasons, the Court denies Greenbrier's motion with regard to contractual liability and grants, on its own motion, summary judgment in Carroll's favor on Count 1.

One last observation should be made here. Greenbrier's claim that there is no genuine dispute about contractual liability because Carroll considered the April 5 letter to be an offer does not hold water. At Carroll's deposition, his attorney objected to a question by Greenbrier's counsel about whether the letter was "in effect, your offer to scrap railcars." Pl. Statement of Facts, Ex. E at 18. Carroll's attorney explained his

objection by saying that "'offer' has a lay meaning and also has a legal meaning. I will let him answer the question with regard to his lay understanding." *Id.* at 18-19. Counsel for Greenbrier responded that this was "[f]air enough," indicating assent. *Id.* at 19. Thus, although Carroll considered the April 5 letter an "offer" in the lay sense, Greenbrier is on thin ice when it says, on the basis of Carroll's testimony, that it is undisputed that the letter was an offer in the more precise legal sense. But even if Carroll had believed the letter to be an offer in this sense, it would not affect the outcome because, as the Court has said, the letter objectively lacks definite and certain terms that would make it capable of acceptance.

### B. Unjust enrichment claim

Greenbrier also claims that Carroll is liable under an unjust enrichment theory. Under Illinois law, recovery for unjust enrichment is available when the plaintiff has no adequate remedy at law, the defendant has unjustly retained a benefit to plaintiff's detriment, and that retention violates fundamental principles of justice, equity, and good conscience. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989) (citing *Drury v. County of McLean*, 89 Ill. 2d 417, 425-26, 433 N.E.2d 666, 670 (1982)).

Carroll argues that an unjust enrichment claim "cannot be maintained because [Greenbrier] has moved for summary judgment on its incompatible breach of contract claim." Def. Mem. at 3. Alternative theories are appropriate at the pleading stage, but "we are now at the proof stage," Carroll argues. *Id.* at 4. Carroll apparently means by this that a party may not move for summary judgment on mutually exclusive alternative

theories because it must argue that the undisputed facts establish each of two things that, by definition, cannot coexist.

Carroll's argument is wide of the mark. The Court has found no cases in which a court has prevented a party from moving for summary judgment on alternative theories. Nor do the cases Carroll cites support such a rule. When parties move for summary judgment on both breach of contract and unjust enrichment claims, courts routinely dispose of the unjust enrichment claim after determining that a contract exists. *E.g.*, *Matthews v. George Weston Bakeries Distrib., Inc.*, No. 06-14875, 2007 WL 2952155, *5 (E.D. Mich. Oct. 9, 2007) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193 (1987)). These cases do not suggest, however, that it is improper *a priori* to seek summary judgment on two alternative theories. Nor do they suggest that arguing there is no genuine issue of material fact as to one alternative theory affects the availability of recovery on the other.

Beyond the unsupported assertion that Greenbrier may not move for summary judgment on both breach of contract and unjust enrichment claims, Carroll offers no argument that the elements of an unjust enrichment claim are not met. Even without that concession, the Court would rule in Greenbrier's favor. Thus, he effectively has conceded that summary judgment on that claim is warranted. The Court has already determined that no contract exists between Greenbrier and Carroll, and thus Greenbrier has no adequate remedy at law. Carroll has unjustly retained the proceeds from his sale of the railcars, to Greenbrier's detriment. Notably, Carroll acknowledges he owes Greenbrier some amount for the railcars beyond the $60,000 he has paid it. *See* Def. Statement of Facts, Ex. 10 at 88. Finally, Carroll's retention of that benefit violates

11

fundamental principles of justice, equity, and good conscience. *See HPI Health Care Servs.*, 131 Ill. 2d at 160, 545 N.E.2d at 679. For the three-plus years since Carroll last made a payment to Greenbrier, he has kept the proceeds from his sale of Greenbrier assets without passing on to Greenbrier anything more than what Carroll himself acknowledges is only partial payment for the assets he sold. For these reasons, and in the absence of any argument by Carroll that a genuine issue of fact exists on these points, the Court grants Greenbrier's motion for summary judgment as to Carroll's liability on the claim of unjust enrichment.

## II.     Amount of Greenbrier's recovery

Greenbrier contends that it should recover the total amount Carroll received from Brandenburg and Progress Rail for the railcars and wheel sets sent by Greenbrier, less the $60,000 Carroll has already paid Greenbrier, plus interest under 815 ILCS 205/2. Greenbrier's figure is $212,895.37, of which $31,707.52 is prejudgment interest, calculated from June 2004. Carroll counters that Greenbrier misstates the amount he was paid for Greenbrier's railcars and also argues that Greenbrier's overall recovery should be limited.

Greenbrier uses the term "damages" to describe the recovery it seeks on its unjust enrichment claim. This recovery is more aptly labeled restitution, both because its only substantive basis is to prevent unjust enrichment—there is no contract in this case—and because its measure is the net gain to the defendant rather than the loss to the plaintiff. *See Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill.2d 248, 257-58, 807 N.E.2d 439, 444-45 (2004) (citing Dan B. Dobbs, *Law of Remedies* § 3.1, 278 (2d

ed.1993)). Accordingly, the Court will use "restitution" rather than "damages" in connection with the recovery Greenbrier seeks.

A. **Amounts paid to Carroll by Progress Rail**

Preliminarily, the Court notes that the restitution issue is complicated—though only slightly—by an apparent addition error and a minor, separate but related inconsistency that appears in both Greenbrier's brief and its Local Rule 56.1 statement. The addition error is easily resolved. Greenbrier asserts that Carroll's invoices to Progress Rail were for $16,000 and $40,800 and that the total amount invoiced was $60,800. This sum is obviously wrong, but the correct one is also obvious: Exhibit L of Greenbrier's Local Rule 56.1 statement shows that the second invoice is actually for $44,800, not $40,800, making the total amount in fact $60,800. This sum can also be derived easily from Greenbrier's brief, which gives the price for each wheel set and the number of cars covered by the second invoice. Carroll's denial on the ground that Greenbrier's "math does not add up," Def. Resp. to Pl. Statement of Facts ¶ 24, is of no consequence given the obviousness of both the mistake and the correct sum.

A related inconsistency in Greenbrier's numbers is also fairly simply resolved. In paragraph 23 of the its Local Rule 56.1 statement, Greenbrier gives $60,800 as the amount Carroll was paid for wheel sets from Greenbrier railcars. In the next paragraph, however, the numbers it provides for Progress Rail's payments to Carroll sum to $60,750. The number in paragraph 23 is based on invoice amounts and, inferably, Progress Rail's "bal[ance] due paid 8-8-05" notation on the last of its payment vouchers relating to these transactions. *See* Pl. Statement of Facts, Ex. L. The number in paragraph 24 is based on amounts Progress Rail actually paid, as reflected in Progress

13

Rail's payment vouchers and the corresponding checks made out to Carroll. It appears that Progress Rail did not actually pay the full balance due on Carroll's invoice number 61604A, resulting in the $50 disparity between the two figures. Accordingly, the Court regards $44,750 as the true amount Progress Rail paid Carroll on the 61604A invoice.

### B. Source of the wheel sets sold to Progress Rail

The parties do not dispute that Brandenburg paid Carroll $180,357.85. They disagree, however, about the amount Progress Rail paid for wheel sets taken from Greenbrier railcars, as opposed to cars that may have come from another source. Greenbrier obtained by subpoena two invoices Carroll sent Progress Rail and checks from Progress Rail to Carroll. The first of these invoices (numbered FU 1001), in the amount of $16,000, was issued on May 4, 2004. Progress Rail paid all but $130 that same month and satisfied the balance as part of a larger payment to Carroll on August 4, 2005. The second invoice (numbered 61604A), was issued on June 16, 2004 for $44,800. Progress paid $33,350 of this amount on July 22, 2004 and paid another $11,400 of the balance as part of the August 4, 2005 payment to Carroll.

Carroll disputes that the $16,000 he received on the FU 1001 invoice was for wheel sets from Greenbrier cars. His position is that this payment was instead for wheel sets from First Union railcars that Carroll arranged to have scrapped at another facility in 2004, the same year that Carroll and Greenbrier did business. In contrast, he is silent on the 61604A invoice, and thus he appears to concede that the corresponding $44,750 he received from Progress was for wheel sets from Greenbrier railcars. Thus, with regard to the $16,000 paid on the FU 1001 invoice, it appears that a genuine issue of material fact—namely, the source of the wheel sets covered by this invoice—exists.

14

Although this amount is only a fraction of what Carroll has retained from the sale of Greenbrier railcars to Brandenburg and from the sale of the wheel sets to Progress Rail, it is nonetheless disputed.

### C. Measure of restitution to Greenbrier

Carroll makes two additional arguments in support of his contention that the Court should scale back the measure of Greenbrier's overall recovery. First, he says that Greenbrier's recovery for unjust enrichment should be limited to the amount that Greenbrier asserts, in connection with its breach of contract claim, it would have received under the parties' putative agreement. Second, Carroll argues that Greenbrier is not entitled to the full amounts he received from Brandenburg and Progress Rail because that would fail to account for the role Carroll's "work and contacts" played in the transactions, a fee Carroll claims he paid Brandenburg to remove the wheel sets from the Greenbrier cars, and Carroll's right to a profit, as contemplated by the April 5, 2004 letter. Def. Mem. at 5-6.

#### *1. The parties' putative bargain*

Carroll's first argument is unpersuasive. The Court has found no case that holds, as Carroll contends, that "damages [in an unjust enrichment case] should not be fixed at a figure that is greater than the amount that the plaintiff maintains is bargained for" because "such a windfall would unjustly benefit the plaintiff." Def. Mem. at 5. The case on which Carroll relies for this proposition, *Munjal v. Baird & Warner, Inc.*, 138 Ill. App. 3d 172, 485 N.E.2d 855 (1985), does not articulate any such rule. In *Munjal*, a property buyer established that defendants had fraudulently concealed a flooding

problem and was awarded damages by a jury. The improper "windfall" resulted from the jury's use of a bank appraisal of the property's value, rather than the purchase price paid by the plaintiffs, to calculate fraud damages. (Under Illinois law, one method for calculating damages when a property buyer has established fraud is to subtract the value of the property taking in account to the fraudulently concealed defects from the value the property would have had without those defects; the bank appraisal the jury in *Munjal* used for the latter figure was greater than what plaintiffs had paid for the property.) The Illinois Appellate Court found this to be error. In doing so, the court said that "[s]uch unjust enrichment is not the intent of giving plaintiffs 'the benefit of their bargain.'" *Id.* at 187, 485 N.E.2d at 866 (quoting *Kinsey v. Scott*, 124 Ill. App. 329, 341, 463 N.E.2d 1359, 1367 (1984)). It is apparently this passage that Carroll reads to create a connection between unjust enrichment, "windfalls," and the parties' bargain as a measure of unjust-enrichment damages.

But, as noted above, *Munjal* supports no such idea. First, the case did not concern unjust enrichment as a theory of recovery. The Illinois court used the phrase "unjust enrichment" as a synonym of "windfall," not to describe a basis for recovery in implied-contracts cases. Second, the mention of "the benefit of the bargain" in the passage from *Munjal* quoted above refers back to the broad measure of damages for fraud victims under Illinois law. *Id.* Finally, *Munjal* has no bearing on this case because it involved a sale contract, i.e., an express agreement between the parties. Although that agreement was tainted by the seller's fraudulent concealment, it nonetheless provided a benchmark for measuring damages. No agreement exists here, as the Court has previously ruled.

In sum, Carroll's attempt to limit Greenbrier's recovery for unjust enrichment by drawing on *Munjal* is misplaced.

### 2. *Carroll's profits from sales to Brandenburg and Progress Rail*

Carroll fares better with his argument that Greenbrier should not be permitted to recover the full amount he earned from sales of the railcars and wheel sets, less the $60,000 he has paid Greenbrier to date. Preliminarily, the Court notes that neither side analyzes in depth or cites any authority on this aspect of the measure of restitution. Greenbrier flatly asks that it be awarded an amount equal to Carroll's profit—that is, his total revenue less the $60,000—by saying "it would be manifestly unjust to allow Carroll to keep *any* of the payments he received from Brandenburg or Progress Rails." Pl. Mem. at 9 (emphasis added). As noted above, Carroll counters that this would negate the role his "work and contacts" played, the fee he says he paid Brandenburg to remove the wheel sets, and his claimed right to the $45 profit contemplated by the April 5, 2004 letter.

The Court agrees in principle that an award in the amount Greenbrier requests might improperly discount to zero Carroll's efforts to arrange the sales. Greenbrier appears to view this case as involving the particular unjust-enrichment fact pattern in which a third party transfers a benefit to the defendant rather than to the plaintiff, whether by mistake or because of wrongful conduct by the defendant. Thus, Greenbrier asserts that the payments Brandenburg and Progress Rail made to Carroll "rightly should have been paid to Greenbrier." Pl. Mem. at 9. This contention glosses over Carroll's role as a broker—a role that is, in principle if not in practice in this case, perfectly legitimate. Indeed, when Rea spoke with Carroll, he apparently understood

17

that Carroll "was not somebody that normally did scrap cars," but instead planned to hire work crews specifically for the job and sell the scrap on to steelmakers. Def. Statement of Facts, Ex. 5 at 13. For this reason, Greenbrier has no *a priori* claim to the gross receipts from these sales as such.

Similarly, awarding Greenbrier Carroll's gross receipts from the sales to Brandenburg and Progress Rail would also give Carroll credit for his outlay for wheel removal—an outlay that the Court, for summary judgment purposes, can assume Carroll actually made. On the other hand, Carroll's claim to a $45 per gross ton profit "as set forth in his April 5, 2004 letter," Def. Mem. at 6, cuts no ice; a proposed term of a contract that was never formed does not govern the measure of restitution.

The use of a defendant's profits as a measure of restitution—a remedy analogous to consequential damages—is not the norm. As a noted treatise on remedies puts it, "[t]o require a defendant to give up profits may operate with particular severity because at least some of the profits would almost always be attributable to the defendant's efforts or investment." Dan B. Dobbs, *Law of Remedies* § 4.1(4), 567 (2d ed. 1993). Rather, "the profit measure of restitution is extraordinary," in the sense that it typically is found in cases of clear wrongdoing by the party unjustly enriched, such as breach of fiduciary duty. *Id.*

Even when, for example, a court imposes a constructive trust on profits that a defendant has earned through wrongdoing, the appropriate measure typically is *net* profits, "determined by reducing the gross revenues generated from the wrongfully-obtained business by those cost-of-sale items and other expenses which the court concludes were not fixed," i.e., those costs that related directly to the wrongfully-

18

obtained business. *Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 1085, 571 N.E.2d 1085, 1097 (1991) (internal citation and quotation marks omitted); *see also, Williams Elec. Games v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (in commercial bribery cases, victim may recover in restitution the profits the briber received by virtue of paying the bribe, measured by "the revenue that the bribe generated for the briber, minus the cost of goods sold and any other variable costs incurred in making the sales that generated the revenue"); *but see Warren v. Century Bankcorporation, Inc.*, 741 P.2d 846 (Ok. 1987) (plaintiffs in unjust enrichment case allowed to recover defendant's gross profits, with no allowance made for business expenses or the portion of gross profits fairly attributable to defendant's management efforts and investment).

Carroll manages to outline a dispute about both the role his entrepreneurial efforts played in the transactions at issue here and expenses he claims to have incurred in connection with them, which might properly be deducted in a net profits calculation. In contrast, Greenbrier does not propose a calculation for Carroll's net profits to which it is entitled. Nor does it argue—except in a conclusory way—that it is entitled to Carroll's gross profits because, for example, of particularly egregious wrongdoing on Carroll's part.

In sum, summary judgment as to the amount of restitution is inappropriate because the parties dispute the measure of the recovery to which Greenbrier is entitled. (With regard to interest, the existence of genuine disputes as to the proper measure of Greenbrier's basic recovery obviously precludes a reliable calculation of interest.) To be clear, however, Carroll will have the burden of showing precisely what variable costs, including the fee he claims he paid Brandenburg to remove the wheel sets, should be

deducted from the amount Greenbrier may recover in restitution. *See Hill*, 212 Ill. App. 3d at 1084, 571 N.E.2d at 1097.

**Conclusion**

For the reasons stated above, the Court grants plaintiff's motion for summary judgment as to liability as to Count 2 but denies the motion as to the amount of restitution [docket no. 27]. The Court grants, on its own motion, summary judgment in favor of defendant on Count 1. The parties are directed to appear for a status hearing at 9:30 a.m. on July 2, 2008.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 17, 2008